23CA0967 Peo v Walker 12-26-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0967
Douglas County District Court No. 22CR557
Honorable Theresa Slade, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher Courtland Walker,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE GROVE
Freyre and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

---

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Lauren Sposa, Deputy State
Public Defender, Castle Rock, Colorado, for Defendant-Appellant

¶ 1     Defendant, Christopher Courtland Walker, appeals the judgment of conviction entered upon jury verdicts finding him guilty of one count of attempted unlawful sexual contact and one count of unlawful sexual contact.  We affirm.

## I.     Background

¶ 2     The prosecution presented evidence at trial from which the jury could have found the following facts.

¶ 3     On the night of the events in question, K.P. and her fiancé, E.T., were living in a hotel room.  They had spent the day getting groceries, and when they returned to their room, K.P. was drunk and bickering with E.T.  As they walked in, they noticed that the room smelled like marijuana.  So, the couple called the front desk and asked to switch rooms.  A staff member came up to investigate but then left, indicating he needed to check to see if it was possible to switch rooms.

¶ 4     Walker, a repeat customer of the hotel, was in a room down the hall.  After overhearing the couple's request, he knocked on their door and invited them to his room.  He claimed to be an employee of the hotel and asked them to join him while they waited for updates about their possible room change.

1

¶ 5    Once everyone was inside Walker's room, he offered the couple whiskey and they accepted. Walker then told E.T. that their new room was ready, and that he should go to the front desk for the keys. When E.T. arrived at the front desk, however, the employee there said no one had sent for him and that there was no room ready.

¶ 6    E.T. returned to Walker's room, where he found Walker offering an already heavily intoxicated K.P. drugs. Over K.P.'s protests, E.T. attempted to help K.P. back to their room. However, K.P. was so inebriated that she was unable to walk on her own. E.T. asked Walker to help him guide K.P., and he did so.

¶ 7    When they arrived at their room, however, Walker pulled K.P. inside and closed the door, leaving E.T. locked out. E.T. pounded on the door and tried to unlock it to no avail and then, believing that his key had stopped working, went to the front desk to get a new key. While at the front desk, he learned Walker did not work for the hotel.

¶ 8    E.T. returned to the room to try his new key. It did not work. He pounded on the door while shouting "Police are here," and Walker opened it. As E.T. entered, he saw K.P. naked and facedown

2

on the bed, "biting her arm." Her "rearend was in the air" and there was "blood down both insides of her thighs." Walker was wearing all of his clothing except for shoes and socks.

¶ 9 A fight between K.P., E.T., and Walker ensued. Walker then left the room. K.P. followed him into the hallway but hit her head against the wall and fell. E.T. then called 911.

¶ 10 Police arrived a few minutes later. K.P. was on the floor in the hallway, with E.T. and Walker standing over her. She was shouting for E.T., severely under the influence, and did not realize she was naked. At least one police officer suspected that both E.T. and Walker might have been under the influence of methamphetamine but he never confirmed his suspicions.

¶ 11 The police took K.P. to the hospital for a forensic examination. She initially refused to be examined, stating that she did not have sex and nothing physical happened between herself and Walker. However, she later reported to the nurse that she "knew sexually something was wrong."

¶ 12 Although the examination revealed signs of blunt trauma on K.P.'s cervix, potentially caused by a fingernail, and an abrasion on her labia, the examiner stated it was impossible to determine if

3

these injuries occurred simultaneously or if they were the result of nonconsensual sex. DNA collected from Walker's underwear and K.P.'s genital swabs contained a mixture of the victim's DNA and the defendant's DNA. Other swabs, including a penile swab from Walker, were inconclusive.

¶ 13    Several days later, Walker was charged with attempted sexual assault against K.P. and third degree assault against E.T. The jury found Walker guilty of the lesser included offenses of attempted unlawful sexual contact and unlawful sexual contact and acquitted him of the third degree assault charge. The trial court sentenced Walker to 364 days in county jail.

## II.    Motion for Mistrial

¶ 14    Walker contends the trial court abused its discretion when it denied his motion for a mistrial after a prosecution witness referenced K.P.'s history of sexual trauma. We are not persuaded.

### A.    Additional Facts

¶ 15    Before trial, Walker filed a motion in limine that sought to preclude evidence about K.P.'s history of suffering sexual abuse, which was unrelated to the case against Walker. The prosecutor did not oppose the motion and said that she did not "anticipate

4

anything like this coming in." She also told the court that she would "advise the witnesses regarding past sexual history trauma and habits or conduct."

¶ 16    During trial, however, while testifying for the prosecution about K.P.'s initial indecision about undergoing a sexual assault examination, a police officer made the following statement:

> And while I was speaking with her [at the hospital, about] how she was confused with the timeline of them all being in [Walker's] room and her saying that he was making advances on her and she's been a victim of this in the past . . . .

¶ 17    At this point, the prosecutor cut the officer off. Defense counsel objected, and then at a bench conference, moved for a mistrial. Counsel argued that the statement evoked sympathy for K.P., whose credibility was central to the prosecution's case, and claimed the prosecutor had violated a court order by failing to advise the officer that he should steer clear of K.P.'s history while testifying. The prosecutor maintained that she had, in fact, taken steps to ensure that the witness knew of the prohibition, but the witness stated that he had not been told of or read any such instruction.

¶ 18    Although the court was critical of the prosecutor's failure to confirm that the witness had been advised of the restrictions on testimony about K.P.'s past trauma, it declined to order a mistrial. The court acknowledged the importance of K.P.'s testimony to the case, but it noted, among other things, that the prosecutor did not intentionally elicit the offending testimony and quickly stopped the witness once she realized what was happening, and that the jury — which had actively submitted questions throughout the trial — did not inquire further about the disclosure.  The court offered to provide a curative instruction to the jury, but defense counsel declined out of concern that such an instruction would only highlight the inappropriate testimony.

B.    Standard of Review and Applicable Law

¶ 19    A mistrial is a drastic remedy that should be granted only if prejudice to a defendant is so substantial that it cannot be remedied by other means.  *People v. Dore*, 997 P.2d 1214, 1221 (Colo. App. 1999).  A trial court can better evaluate any adverse effect that improperly admitted evidence might have on a jury than can a reviewing court.  Thus, absent an abuse of discretion, the

trial court's denial of a motion for mistrial will not be disturbed on review. *People v. Ned*, 923 P.2d 271, 274 (Colo. App. 1996).

¶ 20 Factors relevant to whether a mistrial is warranted include the nature of the inadmissible evidence, the weight of admissible evidence of guilt, and the value of a cautionary instruction. *People v. Van Meter*, 2018 COA 13, ¶ 11.

## C. Analysis

¶ 21 We perceive no abuse of discretion by the trial court in denying Walker's motion for a mistrial.

¶ 22 The reference to K.P.'s history of sexual trauma was not substantially prejudicial. While we agree that the statement violated the court's order (and the parties' agreement), it was both vague and fleeting. *Cf. People v. Abbott*, 690 P.2d 1263, 1269 (Colo. 1984) (a single, unelicited, nonspecific reference to the defendant's past criminal acts did not require a mistrial). The prosecutor did not intentionally elicit the statement; moreover, she immediately cut the witness off when she realized what was happening and never referred to the testimony again. *See People v. Everett*, 250 P.3d 649, 663 (Colo. App. 2010) (affirming denial of mistrial when the improper reference was "fleeting and ambiguous" and not "an

7

intentional circumvention" of the trial court's order excluding the evidence). In addition, based on its observation of the jury — which, the court noted, had been very active throughout the trial — and the lack of any follow-up questions about the statement from the jurors, the trial court inferred that the officer's reference to K.P.'s history did not have an adverse effect on the jury. *See Ned*, 923 P.2d at 274-75.

¶ 23 The trial court also offered to instruct the jury to disregard the improper testimony. The defense chose not to request such an instruction to avoid calling attention to it. Thus, the defense tactically decided not to pursue one means of curing any potential prejudice. *See Vigil v. People*, 731 P.2d 713, 716 (Colo. 1987); *cf. Domingo-Gomez v. People*, 125 P.3d 1043, 1054 (Colo. 2005) ("The lack of an objection may demonstrate the defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." (quoting *People v. Rodriguez*, 794 P.2d 965, 972 (Colo. 1990))).

¶ 24 The isolated reference to K.P.'s past trauma was not so prejudicial that it necessitated a mistrial. Thus, we conclude that

the trial court did not abuse its discretion in denying Walker's motion.

## III.     Cross-Examination

¶ 25     Walker contends that the trial court violated his constitutional right to confrontation when it limited his cross-examination of K.P. Specifically, Walker claims that his attorney should have been permitted to question K.P. about the fact that the first time she accused Walker of assault and agreed to cooperate with the prosecution was while she was being held in the Arapahoe County Jail on pending misdemeanor charges.  We disagree.

### A.     Additional Facts

¶ 26     Walker was charged with attempted sexual assault and third degree assault in May 2022.  However, it was not until nearly nine months later, in February 2023, that prosecutors spoke with K.P. about the incident.  Their first meeting took place pursuant to a subpoena in the Arapahoe County Jail, where K.P. was being held after she was arrested on misdemeanor charges in another case. According to defense counsel, it was during this meeting that K.P. first "indicate[d] that she was touched or penetrated in any way" by Walker.

¶ 27    At trial, Walker's counsel attempted to impeach K.P.'s credibility by pointing out that she had not begun cooperating with prosecutors until she was interviewed at the jail.  Addressing the prosecutor's relevance objection, defense counsel argued that "the fact that the first time she ever said she was penetrated by Mr. Walker is when she's being interviewed by the DAs in the jail" bore on K.P.'s credibility because the circumstances of the interview gave her "motive and bias" to implicate Walker.  In response, the prosecutor maintained that the location of the meeting was irrelevant for two reasons: (1) she and her co-prosecutor in Walker's case "had no involvement" in K.P.'s misdemeanor case and did not "make any promises" in exchange "for her testimony in this case"; and (2) the misdemeanor charges on which K.P. was being held at the time of the interview had been dismissed before Walker's trial. The court sustained the objection.

B.    Standard of Review and Applicable Law

¶ 28    "Appellate review of a possible Confrontation Clause violation is de novo."  *Bernal v. People*, 44 P.3d 184, 198 (Colo. 2002). Otherwise, we review a trial court's evidentiary rulings for an abuse of discretion.  *Merritt v. People*, 842 P.2d 162, 167 (Colo. 1992).  A

10

court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, which necessarily occurs when it misapplies the law. *Id.*

¶ 29     At trial, criminal defendants are guaranteed the right to confront the witnesses against them. U.S. Const. amend. VI; Colo. Const. art. II, § 16. This right is primarily secured through cross-examination. *Margerum v. People*, 2019 CO 100, ¶ 10 (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). "[T]he scope and duration of cross-examination is controlled by the trial court, and judges have wide latitude under the Confrontation Clause to impose reasonable limits on cross-examination because of concerns about harassment, prejudice, repetition, or marginal relevance." *Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008). But a trial court may err if it "prohibits or severely limits inquiry into the potential bias of the witness." *Id.* "A defendant makes out a Confrontation Clause violation by showing that he or she 'was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness,'" and thereby to expose jurors to facts from which they could "appropriately draw

inferences" related to the witness's reliability.  *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

¶ 30    In the context of cross-examination on a witness's pending criminal matters, these principles indicate that confronting a witness with "mere arrests or pending charges . . . , without more," is generally improper.  *People v. King*, 498 P.2d 1142, 1144 (Colo. 1972).  This is because "want of credibility may not logically be inferred from naked accusations of which the law presumes a person innocent until convicted."  *Id.*

¶ 31    However, this general rule has an important exception. "Although evidence of pending charges cannot be admitted to challenge a witness's *general* credibility, this evidence is admissible to show a witness's motive, bias, prejudice, or interest in the outcome of a trial."  *Kinney*, 187 P.3d at 559 (emphasis added). "[T]he partiality of a witness is *always* relevant."  *Margerum*, ¶ 10 (emphasis added).  Thus, a defendant can demonstrate a Confrontation Clause violation on appeal by "merely show[ing]" that there is a "*possibility* . . . the witness's testimony was being influenced by a . . . mere hope . . . of [] leniency with the pending charge in exchange for favorable testimony against the defendant"

and that the trial court "severely limit[ed]" cross-examination regarding this potential source of bias. *Kinney*, 187 P.3d at 559-60.

## C. Analysis

¶ 32 Relying primarily on *Kinney* and *Margerum*, Walker contends that defense counsel should have been permitted to cross-examine K.P. about the circumstances of her jail interview because those circumstances shed light on her credibility. But *Kinney* and *Margerum* both involved witnesses who had criminal matters pending at the time they *testified.* As a general rule, criminal matters that are pending at the time of a witness's testimony are always relevant to a witness's credibility due to her vulnerable position. *See Margerum*, ¶ 13; *Kinney*, 187 P.3d at 552. It does not follow, however, that a crime victim who merely agrees to be interviewed by law enforcement during the pendency of her own criminal charges, without more, is in an equally vulnerable position. *See Kinney*, 187 P.3d at 559 (explaining that a pending charge (and, a fortiori, a dismissed charge) is not enough on its own to be admissible to challenge a witness's credibility).

¶ 33 This is not to say that a witness or victim facing charges at the time she speaks to police (i.e., before testifying) could never be

influenced by the hope or promise of leniency. For example, in *Van Arsdall*, a key witness in a murder trial agreed to speak to the prosecutor in exchange for having a pending charge against him dropped. 475 U.S. at 676. The witness "denied that the agreement had affected his testimony," and the trial court prohibited the defense from cross-examining him about it. *Id.* The Supreme Court held that this ruling violated the Confrontation Clause because allowing cross examination on this topic would have given a reasonable jury a "significantly different impression" of the witness's credibility. *Id.* at 680.

¶ 34 Here, while the charges against K.P. were dismissed at some point before Walker's trial, nothing in the record suggests that the dismissal was part of a bargained-for exchange between K.P. and the prosecution or that the pending charges against K.P. otherwise influenced her statement regarding Walker. *See id.* at 676 (noting that the witness "acknowledged that the drunkenness charge had been dropped in exchange for his promise to speak with the prosecutor about the murder"); *see also Kinney*, 187 P.3d at 559-61 (possibility of influence was shown based on prosecutor's favorable treatment of witness who was facing charges in the same

jurisdiction). Indeed, the prosecutor expressly denied that she made any promises of leniency when she spoke to K.P. about Walker's case. And Walker's arguments to the contrary are speculative. Defense counsel conceded that she had "no idea why" the charges against K.P. were dismissed, and there is nothing in the record suggesting that the district attorney's office made any offer of leniency to K.P. or deviated in any way from its normal protocols when deciding whether to pursue the misdemeanor charges that were pending at the time of her interview.

¶ 35 In short, because there was no indication that K.P.'s statements to law enforcement were influenced by a hope or promise of leniency in her pending misdemeanor case, we are not persuaded that the jury would have been left with a significantly different impression of her credibility had the trial court allowed the defense to cross-examine her concerning the circumstances of her interview. Walker thus falls short of establishing that his right to confrontation was violated.

IV.   Disposition

¶ 36 We affirm the judgment.

JUDGE FREYRE and JUDGE LUM concur.

15